**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMIE GILBERT, o/b/o S.E.,** | ) | |
| **ex rel. SCOTT EDWARDS** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 6550 |
| | ) | |
| v. | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| **CAROLYN COLVIN** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Jamie Gilbert ("Plaintiff") filed this action on behalf of S.E., the minor child of Scott Edwards. Edwards himself died of unspecified causes after the Administrative Law Judge ("ALJ") issued her decision denying his disability claim. Ms. Gilbert seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that denied Scott Edwards' claim for Social Security Income and Disability Insurance Benefits under Title XVI of the Social Security Act. 42 U.S.C. § 1382(c). Plaintiff has filed a motion for summary judgment, and the Commissioner has filed a cross-motion. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons discussed below, Plaintiff's motion [38] is granted, and the Commissioner's motion [47] is denied.

### I. Legal Standard

#### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is

disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step

5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

### A.    Medical History

Edwards' medical records indicate a history of psychiatric treatment beginning at least in June 2004.  Edwards began seeing psychiatrist Dr. Zenaida Vivar at that point for depression, though he was already on the antidepressant medication Zoloft at the time the record in this case begins.  Dr. Vivar noted that his mood was appropriate and that he did not have suicidal thoughts.  Numerous treatment notes throughout 2004, 2005, and 2006 contain the same assessment.  (R. 283-87).  The last note in the record, dated January 2008, suggests a change in Edwards' mental status.  Dr. Vivar noted that he appeared depressed, though she reiterated that he did not have suicidal thoughts.  (R. 267).

Edwards was also treated in a group setting.  Notes from the group meetings, as well as Dr. Vivar's comments, reported that Edwards was not experiencing any side effects from his medication, that he was doing well, and that he had no thought disorders.  The primary changes in the treatment notes throughout 2006 and  2007 involved increased dosages of Zoloft.  By October 2007, Dr. Vivar had raised Edwards' medication from 100 mg. to 200 mg. each day.  (R. 268).

The record does not indicate what treatment Edwards received after his January 2008 appointment with Dr. Vivar.  By April 2009, however, his condition appears to have deteriorated.  Edwards was admitted to the Hartgrove Hospital at that time because of suicidal thoughts that he was experiencing.  Dr. Bernardo Livas stated that Edwards appeared very depressed, suspicious, and paranoid.  (R. 358-61).  Edwards reported that he had stopped taking his medication for several weeks.  He was treated with Zoloft and

other medications, and was released one week later for outpatient care with psychiatrist Dr. Piyush Buch and counselor Timothy Jenkins. Dr. Livas diagnosed Edwards on discharge as suffering from recurring major depression, alcohol abuse, and back pain. (R. 347-49).

After he was discharged, Edwards continued psychiatric treatment with Dr. Buch from January through September 2010. The nature of that treatment is not entirely clear, as Dr. Buch's short treatment notes are difficult to read. However, they contain Edwards' own self-reported feelings, as well as Dr. Buch's comments. These notes suggest that Edwards was experienced increasing levels of distress, though few details are available. He stated at each treatment session, for example, that "everything" was stressful to him and that he had felt at times like hurting himself or others. (R. 387-99). For his part, Dr. Buch checked a box on the treatment notes indicating that Edwards was not having suicidal or homicidal thoughts. Nevertheless, Dr. Buch prescribed Edwards an extensive array of antidepressants, antipsychotics, tranquilizers, and sleep medications during this period. These included sertraline (Zoloft), clonazepam (Klonopin), lithium carbonate (Eskalith), zolpidem (Ambien), bupropion (Wellbutrin), alprazolam (Xanax), risperidone (Risperdal), mirtazapine (Remeron), Lunesta, Cymbalta, trazadone (Desyrel), doxepin (Sinequan), sulfa tablets, and hydrocodone (Vicodin). (R. 385-86).

**B.    Medical Expert Reports**

Dr. Buch issued a very brief letter concerning Edwards in November 2010. He stated that Edwards was unable to work due to his major depressive disorder and that he suffered from severe depression. (R. 384).

On December 15, 2004, state agency physician Dr. Marva Dawkins issued a

5

Psychiatric Review Technique ("PRT") analysis of Edwards' condition. She found that Edwards suffered from depression. He was assessed with a mild restriction in his activities of daily living, and moderate restrictions in his social functioning and ability to maintain concentration, persistence, and pace. (R. 312). No episodes of decompensation were noted. Dr. Marva also issued a mental RFC that found moderate limitations in Edwards' ability to understand detailed instructions, to be punctual, to work a normal workday, and to get along with co-workers. (R. 316-17). Dr. Michael Kovar later agreed with these findings on review. (R. 338-42).

Dr. Herman Langner examined Edwards on behalf of the SSA and issued a report in January 2009. Edwards told Dr. Langner that he suffered from suicidal thoughts, that he felt like sleeping for long periods, and generally "feels horrible." Dr. Langner diagnosed Edwards with depression NOS (not otherwise specified). He assigned Edwards a Global Assessment of Functioning ("GAF") score of 40.[1] (R. 299-301).

### C. Hearing Testimony

Edwards appeared before ALJ Kim Soo Nagle at a hearing held on January 21, 2011. He was 32 years old at the time of the hearing. Edwards was single and the father of one child. He had been living with his mother before they were evicted from their trailer. Edwards was currently living with a friend after having recently lived under a viaduct. Edwards described his primary difficulty as anxiety. He stated that he was ordinarily

---

[1] GAF scores reflect a clinician's assessment of a patient's overall level of functioning. *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000). "GAF scores are intended to be used to make treatment decisions . . . not as a measure of the extent of an individual's disability." *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) (internal quote and citation omitted).

"petrified" to leave the house, despite the medications he took daily to control his anxiety and depression. His primary activity involved watching television. Edwards liked to sit alone in his room with a only a candle for light and to take deep breaths. At times, he needed to lock his bedroom door and hide under the covers of his bed. According to Edwards, "nothing could happen to me" as long as he remained alone in his room. (R. 75).

Edwards stated that his mother, friends, and his girlfriend performed the majority of his daily chores such as food preparation and routine purchases. Cash registers made him too nervous to complete most transactions for himself. Edwards feared that everyone in public looked at him "funny" and could read his thoughts. He described his limitations as emotional, rather than physical, in nature. In particular, he experienced severe anxiety around strangers and did not like working around other people. Edwards testified that he had not held a job since his last employment as a yard worker for a bus company in 2004.

Edwards stated that his problems with anxiety, depression, and anger made it difficult for him to perform even ordinary tasks such as babysitting for his son. He experienced "sick" thoughts and was awakened almost hourly each night by nightmares. However, he was too embarrassed to tell Dr. Buch about his dreams. Edwards complained that his psychiatrist only met with him for a few minutes each time and did not listen to his complaints of wanting to hurt other people. He described certain acts of physical violence and pain as pleasurable releases for him. For example, he felt better after punching holes in the walls of the trailer he shared with his mother and destroying her television set with a hammer. He particularly enjoyed the pain of getting a tattoo on his foot. *See* Record at 77 ("That's a horrible spot to get a tattoo and I just, I love that pain[;] that pain makes me feel good."). (R. 48-81).

Vocational Expert ("VE") Thomas Dunleavy also testified at the hearing. Dunleavy stated that Edwards' prior work as a vehicle cleaner involved unskilled labor at the medium exertion level. Other work as a package handler received the same description, and Edwards' job as a maintenance worker at a hospital was described as unskilled light work. The ALJ then asked the VE if a hypothetical person with Edwards' RFC, as described below, could perform his past relevant work. The ALJ responded that he could perform jobs that Edwards had previously held such as a vehicle cleaner and a warehouse worker. Other hypothetical questions followed. The VE stated that if such a person required no interaction with co-workers, he would not be able to perform these jobs. In response to questions posed by Edwards' attorney, the VE testified that an employer would tolerate one missed work day each month, but not two. Also, a person who walked off the job once a month because of emotional issues such as anger would not be employable. (R. 85-92).

D.    The ALJ's Decision

ALJ Nagle issued a written decision on January 31, 2011 that found Edwards to be not disabled. The ALJ determined at Step 1 that he had not engaged in substantial gainful activity since his alleged onset date of December 15, 2004. The severe impairment of depression was found at Step 2, but the ALJ concluded at Step 3 that it did not meet or medically equal a Listing. Before moving to Step 4, the ALJ assessed Edwards' RFC. She found that he had the ability to work at all exertional levels, though several non-exertional restrictions were imposed. These included work that does involve quotas, that is not performed in close proximity to others, that has a flexible pace and involves one- or two-step tasks that are routine, as well as work that only requires occasional decisionmaking. Edwards was to have only occasional interaction with co-workers and supervisors, and no

8

interactions with the public. The ALJ also determined that Edwards' statements concerning his symptoms were not fully credible. Based on the RFC and the VE's testimony, the ALJ found at Step 4 that Edwards could perform his past relevant work. As a result, she concluded that he was not disabled and did not move to Step 5.

## III. <u>Discussion</u>

Plaintiff challenges the ALJ's decision on four grounds. She contends that the ALJ: (1) failed to properly consider the opinion of Edwards' treating psychiatrist; (2) did not properly evaluate his credibility; (3) failed to assess his RFC correctly; and, (4) erred at Step 4 in her assessment of Edwards' ability to perform his past relevant work. The Court addresses each of these issues in turn.

### A.    The ALJ's Assessment of Dr. Buch's Opinion Was Erroneous

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008). "A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Larson v. Astrue*, 615

F.3d 744, 749 (7th Cir. 2010).

Treating psychiatrist Dr. Buch issued a short letter in November 2010, almost a year after Edwards' last date insured of December 1, 2009. It states in brief terms that Edwards was taking Cymbalta, Sinequan, and Xanax, and that he could not work because of his severe depression. The ALJ found that Dr. Buch's opinion was not entitled to controlling weight because the issue of whether Edwards could work was reserved to the Commissioner. She also found that the opinion could not be given great weight because Dr. Buch's treatment records did not include any indications of psychiatric abnormalities that supported the treating psychiatrist's conclusion.

Plaintiff concedes that the ALJ was not required to give Dr. Buch's opinion controlling weight under the treating physician rule. However, the fact that a treating physician's report cannot be given controlling weight does not allow an ALJ to reject it out of hand. SSR 96-2p; *Larson*, 615 F.3d at 751. The ALJ must still weigh the opinion under the factors laid out in the regulations. Plaintiff claims that the ALJ in this case simply rejected Dr. Buch. The Commissioner contends that she evaluated his short report, but correctly decided to give it less than substantial weight.

Neither of these positions is persuasive. The ALJ's minimal discussion of the treating psychiatrist's report is far from clear, but she did make some effort to assess Dr. Buch by deciding that his opinion was not entitled to "great" weight. That does not constitute a rejection of the opinion. Indeed, the ALJ relied on it in other parts of her decision to refute Edwards' claim that he suffered from uncontrollable anger. (R. 35). The ALJ could only logically do so if she believed that the report had some aspects that could be relied on to reach her decision on Edwards' credibility. What those aspects were,

10

however, were never stated, and the ALJ failed to assign any specific weight to the treating psychiatrist. Given that remand is necessary on other grounds, the ALJ is instructed to clarify what weight she gave to Dr. Buch. *See Ridinger*, 589 F. Supp.2d at 1006 (stating that an ALJ must always make clear to subsequent reviewers what weight was given to a treating physician's opinion); *see also David v. Barnhart*, 446 F. Supp.2d 860, 871 (N.D. Ill. 2006) ("The weight given to a treating physician cannot be implied[.]").

Plaintiff further claims that remand is necessary because the ALJ only addressed one of the regulatory factors used in evaluating a treating physician – an alleged lack of consistency between Dr. Buch's conclusion and his treatment notes. The Court disagrees. An ALJ is not necessarily required to discuss each of the six regulatory factors in her decision as long as she "considers" them. *See Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999). It is often difficult to determine whether an ALJ has done so in cases of this type because credibility discussions are frequently intertwined with other issues. However, Plaintiff overlooks that here the ALJ addressed at least two additional factors by noting that Dr. Buch was Edwards' treating psychiatrist and that he had seen Edwards on a monthly basis beginning in January 2010. (R. 33, 35).

That said, the Court disagrees with the Commissioner that the ALJ's brief mention of these two factors justifies her evaluation of Dr. Buch's opinion. As with other issues in this case, the ALJ failed to draw any logical connection between these statements and her conclusion. Dr. Buch treated Edwards longer than any physician other than Dr. Vivar. Unlike the non-examining physicians to whom the ALJ gave "great" weight (R. 29),[2] Dr.

---

[2] Plaintiff does not object to the great weight the ALJ gave to the state agency reviewers, but the Court has serious concerns on this issue. The ALJ did not account for

Buch had first-hand familiarity with Edwards' mental condition and prescribed a variety of potent medications to treat his depression. Such long-term personal knowledge supports, rather than undermines, a treating physician's opinion. The ALJ was at least required to discuss why that was not the case if she believed differently. As it stands, she said nothing on how Dr. Buch's treating relationship affected the weight given to his report. (R. 36).

The ALJ's sole reason for discounting Dr. Buch's report was that "his treatment records do not include any psychiatric signs (i.e., abnormalities of behavior, mood, thought, memory, orientation, development, or perception)" to support the doctor's conclusion. Neither the ALJ nor the Commissioner addresses what "psychiatric signs" include or what it was the ALJ found missing in Dr. Buch's notes. The Court's best guess as to the ALJ's meaning is that she intended to reference the standard set out in Listing 12.00B for assessing a mental disorder. *See* Listing 12.00B ("Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source.").

Unfortunately, this fails to clarify what it was the ALJ thought that Dr. Buch's notes should have included, and the Commissioner does not address the notes' content. It could

---

any of the regulatory factors in her assessment of these doctors. A state agency physician can be given greater weight than a claimant's own physician under some circumstances, but a non-examining source must be weighed more *strictly* than a treating source. *See* SSR 96-6p. The Court notes that three of the four agency physicians issued their reports before Edwards began showing the serious signs of suicidal thoughts that led to his hospitalization. As the ALJ herself noted, the one reviewer who issued an opinion after the hospitalization failed even to take cognizance of that important fact. (R. 33). The ALJ shall explain on remand how her decision complies with the guidelines set out in SSR 96-6p on this issue. This shall include an explanation of how great weight can be given to assessments that failed to account for all of the relevant medical evidence.

not have been the absence of tests or other "objective" data because it is well-established that a psychiatrist's opinion "may rest either on *observed signs and symptoms* or on psychological tests[.]" *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (emphasis added); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) ("The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.") (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)). Dr. Buch's report and notes were based on his direct observation of Edwards over at least a ten-month period.

The ALJ may have meant that Dr. Buch's records lacked any noteworthy discussion of Edwards' complaints or did not contain sufficient indications of his mental disorder. The notes are spare, but their brevity does not appear to have been the source of the ALJ's difficulty. Instead, she found in other parts of the decision that Dr. Buch's notes "do not include any specific abnormal . . . findings." (R. 33). The Court cannot follow the basis of this reasoning. The ALJ herself acknowledged that Dr. Buch's notes stated that Edwards suffered from major depression. (R. 33). That diagnosis is listed on several treatment notes. The Court fails to understand how a psychiatrist who diagnoses a patient with major depression after months of treatment has not made a "specific abnormal finding." Insofar as the ALJ meant something else by her opaque analysis of this issue, she left it unexplained.

The same is true of the medications Dr. Buch prescribed to treat Edwards' mental condition. The report itself identifies three – 60 mg. of Cymbalta (the maximum dose), Xanax, and Sinequan. The ALJ noted these medications but failed to explain why they did

not support Dr. Buch's opinion that Edwards was severely depressed. Equally important, she overlooked entirely that Dr. Buch also prescribed multiple psychotropic drugs for Edwards during a ten to twelve-month period. This included eight different antidepressants and antipsychotics (sertraline, buproprion, mirtazapine, trazadone, Cymbalta, lithium carbonate, risperidone, and doxepin), two sleep medications (Lunesta and zolpidem), and two tranquilizers (clonazepam and alprazolam). (R. 385-86). The ALJ's finding that the notes do not indicate a mood abnormality in the face of this astonishing array of medications is, frankly, baffling. The ALJ could only conclude otherwise by providing a meaningful discussion that draws a logical connection between the evidence and her conclusion on the issue. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). None was given. The ALJ could not conclude that no "signs" supported Dr. Buch's assessment without first recognizing what his treatment notes actually included.

The Commissioner argues that the ALJ reasonably concluded that Dr. Buch's opinion was unsubstantiated by the evidentiary record, particularly the opinions of Dr. Dawkins and the other state-agency physicians. Citing well-established authorities, the Commissioner points out that an ALJ is entitled to discount a treating physician's opinion when it conflicts with the views of a consulting physician that the ALJ finds to be more credible. *See Ketelboeter v. Astrue*, 550 F.3d 620,625 (7th Cir. 2008); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *Walker v. Bowen*, 834 F.2d 635, 644 (7th Cir. 1987).

The Court respectfully disagrees that this line of reasoning can be applied to the facts of this case. Nothing in the ALJ's decision suggests that she discounted Dr. Buch based on an inconsistency between his views and those of other physicians. Certainly, the

14

ALJ did not cite any conflict in her brief explanation of why Dr. Buch could not be given great weight, and she did not rely on an inconsistency to discount his opinion. (R. 36). The Commissioner cannot defend an ALJ's decision on grounds that the ALJ herself did invoke. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).

Moreover, the Commissioner's argument and authorities involve conflicts between treating and consulting physicians. All of the physicians cited as sources for contrary evidence in this case – Drs. Dawkins, Kovar, and Hollerauer – were non-examining state-agency physicians. None were consulting physicians who examined Edwards. The regulations advise ALJs that they are required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). *See also Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal quote and citation omitted). A non-treating source can be given greater weight than a treating physician under certain conditions outlined in SSR 96-6p. As noted above, however, the ALJ made no attempt to follow these guidelines and did not adequately explain the reasons why she gave great weight to the agency physicians.

The Commissioner further argues that it would be a waste of time to remand on this issue because Dr. Buch only began treating Edwards after his last date insured on December 1, 2009. The Court again disagrees on several grounds. "If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to

marshal that support, then remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). That is not the case here. The Commissioner's position assumes that Dr. Buch's opinion, even if it were given weight, would not be especially relevant to the ALJ because it post-dates Edwards' insured period. However, the ALJ did not express any concern over that issue and even relied on Dr. Buch to some degree to assess Edwards' credibility.

It is also unclear that Dr. Buch's treatment of Edwards post-dates December 2009 entirely. It is true that his treatment notes only begin in January 2010. But pharmacy records show that the psychiatrist prescribed several tranquilizers and antidepressants for Edwards during October and November 2009. (R. 385). Dr. Buch presumably interviewed Edwards before he prescribed these medications, indicating that he began his treatment sometime prior to January 2010.

Even if that is not the case, evidence concerning a claimant's post-insured condition can be relevant to an earlier claimed period of disability. *See*, *e.g.*, *Parker*, 597 F.3d at 925; *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984). In this case, Dr. Buch's opinion could be relevant to the ALJ's consideration of Dr. Langner, whom she discounted on the basis of a perceived conflict with Edwards' first psychiatrist, Dr. Vivar.[3] Thus, the Court cannot conclude that it would be a waste of time to remand on this issue, even though Dr. Buch's opinion post-dates the

---

[3] The ALJ pointed out that Edwards' earlier psychiatrist, Dr. Vivar, took a more benign view of his condition. However, the Commissioner does not argue that Dr. Vivar's treatment notes are relevant to the assessment of Dr. Buch. As discussed below, moreover, the record strongly suggests that Edwards' condition deteriorated after he stopped seeing Dr. Vivar in January 2008.

alleged disability period. Plaintiff's motion is granted on this point.

**B.    The ALJ's Credibility Determination Was Flawed**

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The ALJ found that Edwards' statements concerning his symptoms were not "fully credible," though it is unclear what part she credited and what she did not. The Commissioner rightly notes that several of the ALJ's stated reasons support this credibility assessment. The ALJ was critical of the fact that Edwards stated he had not worked since his alleged onset date of December 15, 2004, even though Dr. Vivar's treatment notes indicated that he had been working at various times after that date. Dr. Vivar noted as late as her last treatment note of January 2008 that Edwards had recently "quit his job." (R. 267). Plaintiff claims that Edwards may only have forgotten that he held these jobs. It is

true that none of the positions were significant enough to constitute gainful employment at Step 1. But Plaintiff has not presented any reason why Edwards was not mentally capable of remembering whether he had worked after his onset date.

Citing *Jelinek v. Astrue*, 662 F.3d 805 (7th Cir. 2011), Plaintiff claims that the ALJ could not construe this inconsistency against Edwards without first questioning him about it at the hearing. This is not persuasive. In *Jelinek*, the ALJ failed to question the claimant concerning the hours or demands of her earlier work. The relevant issue was whether the ALJ could rely on "perceived inconsistencies" between that prior work and the claimant's allegation that she could not work full time. *Id*. at 812-13. By contrast, Edwards incorrectly represented that he had not worked at all. This was not a "perceived" inconsistency, but an outright one. Given what appears to have been the fleeting nature of Edwards' work, it might have been better had the ALJ questioned him at the hearing. But the ALJ did not err in concluding that Edwards made inconsistent statements on the issue.

This does not carry the day, however, because the reasoning that underlies the rest of the ALJ's discussion raises grave concerns about the credibility decision. Most seriously, the ALJ found that "little evidence" supported Edwards testimony that he suffered from suicidal impulses. This is – at best – a puzzling conclusion that the Commissioner does not address. Edwards was hospitalized for a week in 2009 after he threatened to kill himself.[4] The notes from the hospitalization clearly state that he suffered from suicidal

---

[4] Three months after the ALJ issued her decision, Edwards was again involuntarily hospitalized when he tried to commit suicide by slashing his wrists. (R. 404). Although the documents on this issue are part of the administrative record, the Court cannot consider them. Evidence submitted for the first time to the Appeals Council cannot be reviewed when, as in this case, the Council denies review. *Eads v. Sec. of Dept. of Health and Human Servs*., 983 F.2d 815, 816-17 (7th Cir. 1993). The Court must limit its review to the

ideations. (R. 385). It goes without saying that being hospitalized for suicidal impulses supports Edwards' testimony that he was suicidal.

The ALJ did recognize that Edwards had been hospitalized. What she appears to have meant by her brief analysis of the issue was that other factors weighed against placing too much weight on that fact. The Court notes that the ALJ quickly tried to reason away the hospitalization's significance by explaining that it was precipitated by Edwards' failure to take his medications and by his drinking. (R. 34). The most reasonable implication of this statement is that, despite his hospitalization, Edwards' symptoms would not be as severe as he alleged if he would only comply with his medication regime.

The ALJ had no basis for reaching such a conclusion without providing further reasoning on this crucial topic. Importantly, she failed to account for the possibility that Edwards' failure to take his medication was itself a symptom of his mental disorder. The Seventh Circuit and other courts have repeatedly stressed that "mental illness in general . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). *See also Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (stating that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"); *White v. Comm. of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009). The ALJ gave no consideration at all to this issue. As for alcohol use, she failed to cite any medical evidence that attributed Edward's

_____

record that was presented to the ALJ.

suicidal thoughts to his recent drinking. The ALJ could not draw a causal link between the two on her own without making a prohibited medical conclusion.

The ALJ also discounted Edwards' credibility by noting gaps in his psychiatric treatment after he stopped seeing Dr. Vivar in January 2008. This, too, was erroneous under the facts of this case. Social Security Ruling 96-7p warns an ALJ that she "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide[.]" SSR 96-7p. An ALJ must always provide a claimant the opportunity to explain treatment gaps before making an adverse credibility decision. *See*, *e.g.*, *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft*, 539 F.3d at 679. That is especially true when, as with Edwards' depression, the claimant's condition is one that can "wax and wane." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). *See also Kangail*, 454 F.3d at 630 ("[M]ental illness . . . may prevent the sufferer from . . . submitting to treatment."). The ALJ in this case did not raise the treatment issue at the hearing or give Edwards an opportunity to explain the gaps. She was not entitled to use interruptions in his treatment to discount his credibility.

The ALJ correctly stated that several contradictions between Edwards' allegations and the medical record existed. Edwards told Dr. Langner in January 2009 that he wanted to sleep for long periods of time and that he had been suicidal. Dr. Langner's report states that Edwards claimed his symptoms had existed for 8 to 10 years. The ALJ noted that Dr. Vivar's earlier treatment notes did not substantiate these suicidal claims. She also pointed out that Dr. Buch's notes consistently stated that Edwards was not homicidal or suicidal.

These contradictions weigh somewhat against Edwards' credibility, and an ALJ's

20

decision should not be overturned merely "because there is a possibility of a benign explanation for a claimant's inconsistencies." *Retlick v. Astrue*, — F. Supp.2d —, No. 10-C-1067, 2012 WL 7760114, at *4 (E.D. Wis. March 26, 2012). However, other factors weigh against placing too much emphasis on the inconsistencies the ALJ cited. The fact that Edwards did not describe such serious symptoms to Dr. Vivar does not mean that the difficulties he expressed to Dr. Langner were not accurate. As discussed below, the record suggests that Edwards' condition deteriorated after he stopped seeing Dr. Vivar. Dr. Langner did not express any doubts on the accuracy of Edwards' stated symptoms, and he assigned Edwards a GAF of 40. GAF scores between 31 and 40 indicate a major impairment in several areas, such as work, family relations, and thinking. *Miller v. Astrue*, No. 4:11-CV-97, 2012 WL 896248, at *5 n. 14 (M.D. Pa. March 15, 2012). Dr. Vivar's notes do not reflect such limitations. The fact that Edwards was hospitalized for suicidal thoughts only three months later further confirms what he told Dr. Langner.

It is also true that Dr. Buch's notes indicate that Edwards was not suicidal or homicidal, though Edwards repeatedly stated on Dr. Buch's intake forms that he wanted to harm himself. Before using this against Edwards, however, the ALJ should have taken account of what Dr. Buch's forms actually stated. Each form required Edwards to check "yes" or "no" for the question, "Do you ever feel like hurting yourself or others?" (R. 392). These questions did not ask Edwards if he was suicidal at the moment, but if he "ever" had such feelings. Edwards marked "yes" for each form. That answer is not obviously incorrect. Edwards clearly experienced suicidal ideations. The fact that Edwards may not have expressed those feelings during his personal sessions with Dr. Buch does not mean that he was untruthful in stating that had them at other times.

The point is not merely theoretical in this case because Edwards expressed significant frustration about his ability to communicate meaningfully with Dr. Buch. He testified, for example, that he was unwilling to tell his psychiatrist about the intense nightmares he experienced. (R. 79). That statement was part of Edwards' severe critique of Dr. Buch as one who "doesn't give a crap" and only meets with Edwards "for two minutes." (R. 79-80). He stated:

> He just lets me go. So, I don't know, maybe I need therapy or something. Somewhere where they will listen to me. . . . [I]t's like he is using me to experiment, like a dummy. Like a test dummy. And, he's like, he don't care. I don't know. A lot of people actually said he is a quack doctor. . . . [S]ometimes I do [feel angry towards him] because he won't listen to me. He writes me off. He just wants to get me in and out. . . . He just don't care."

(R. 80). The Court cannot speculate on how this obvious distrust of Dr. Buch may have affected Edwards' ability to express other difficult feelings to his psychiatrist. But any inconsistencies between what Edwards indicated on an intake form, and what Dr. Buch reported him as saying, must be viewed within the context of a patient who strongly believed that his psychiatrist did not listen to him and "just don't care."

The same analysis applies to Edwards' claim that he suffered from serious anger that sometimes erupted in violence. Edwards testified that he felt better after destroying his mother's television set with a hammer and punching out a wall in his trailer. The ALJ dismissed these allegations largely because Dr. Buch's treatment notes indicated that Edwards was not experiencing any "homicidal ideations." (R. 35, 389). That fails to address the issue. Hitting an object is categorically different from wanting to kill another person. Indeed, Edwards stated that, although he sometimes felt an urge to harm others, his rage did not extend to a homicidal intent. *See* Record at 76 ("I am not going to kill

them, because I don't want to be in prison forever. I know that much, at least."). This is entirely consistent with Dr. Buch's notes.

The ALJ placed considerable stress on the fact that Dr. Vivar's treatment notes did not substantiate Edwards' statements concerning the severity of his symptoms. She correctly noted that Edwards' earlier psychiatrist's notes did not reflect the extent of depression and suicidal thoughts that Edwards testified to at the hearing. They also failed to confirm the statements that Edwards made during his interview with Dr. Langner. As the ALJ rightly implied, Dr. Vivar's notes present a relatively benign portrait of Edwards' condition from April 2004 through the beginning of 2008. They repeatedly indicate that he was depressed but that his mood and functioning were far more controlled than he described at the hearing.

The problem with the ALJ's reliance on Dr. Vivar is that she failed to consider that Edwards' functioning before 2008 was not necessarily commensurate with his mental condition after he stopped seeing Dr. Vivar. Edwards' testimony described his state of mind at the time of the 2011 hearing, not when he saw Dr. Vivar. The record strongly suggests that his mental condition had worsened by the time of the hearing. Much of the evidence already discussed supports that view. Dr. Langner assigned Edwards a GAF of 40, suggesting greater limitations than anything noted by Dr. Vivar. Edwards was hospitalized for suicidal thoughts in 2009, in contrast to the higher-level functioning Dr. Vivar noted. Dr. Buch replaced Dr. Vivar's use of Zoloft as the only antidepressant with the three medications noted above, as well as prescribing seven other antidepressants, antipsychotics, and tranquilizers.

Social Security Ruling 96-7p advises ALJs that a claimant's symptoms can fluctuate

over time:

> Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

SSR 96-7p. This can be particularly problematic when a mental disorder is in question. The Seventh Circuit has stressed that ALJs must take care in such cases to realize that the symptoms of a mental impairment can fluctuate over time. *See*, *e.g.*, *Punzio v. Astrue*, 630 F.3d 704, 710-11 (7th Cir. 2011); *Fuchs v. Astrue*, 873 F. Supp.2d 959, 971 (N.D. Ill. 2012) ("Mental illnesses are episodic by nature."). Although *Punzio* and other authorities often refer to good and bad "days," the record in this case raises the strong possibility that Edwards' mental condition changed over longer time periods. The ALJ did not take this into consideration in assessing Edwards' credibility. Without doing so, it is not clear how she could use Dr. Vivar's notes to evaluate the reliability of Edwards' testimony on the severity of the symptoms he had been experiencing after he stopped seeing Dr. Vivar. *See Jelinek*, 662 F.3d at 812 (suggesting that the time that has elapsed between different assessments of a mental condition should be considered).

Finally, Plaintiff argues that the ALJ failed to explain how Edwards' activities of daily living support her credibility assessment. The Commissioner does not dispute this claim. Edwards testified to a very limited array of activities. His mother and girlfriend bring him food; he has difficulty leaving the house and often hides under the covers; and he awakens every hour with nightmares. The ALJ failed to take note of these statements, but she identified a number of limitations as part of the special technique assessment at Step 3.

Edwards could prepare simple meals and go out of the house once a week. He could care for his basic activities and personal hygiene, but his ability to tend for his small son depended on his emotional state. He preferred to stay at home in his room alone. (R. 29). The ALJ found that these activities, which she appears to have credited, supported a finding that Edwards had a mild limitation in his activities of daily living.

The Court agrees that the ALJ failed to draw any logical connection between these activities and the credibility assessment. In fact, she did not attempt to do so. Edwards' capacity to engage in some activities each day does not automatically mean that his work-related testimony was not credible. It is unclear, for example, why Edwards' ability to go out of the house once a week, or to care for his own hygiene, means that he was not credible in stating that his emotional distress prevented him from working full time. The Seventh Circuit has been clear that an ALJ must "consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). *See also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (noting that washing dishes, cooking, and doing laundry are relatively minimal tasks that are "not of a sort that necessarily undermines or contradicts a claim of disabling pain"). On remand, the ALJ shall clarify how those portions of Edwards' activities that she gave credit to support her assessment of Edwards' statements. Plaintiff's motion is granted on this issue.

### C.    The RFC Assessment

Plaintiff next alleges that the ALJ erred by formulating a RFC that was not supported by the record. The ALJ relied on the state agency physician's finding that Edwards could

sustain simple work "where he has minimal contact with supervisors, coworkers, peers, and the general public." (R. 332). The ALJ's RFC altered the physician's language of "minimal contact" to "occasional interaction." Plaintiff claims this was erroneous because the Social Security regulations and rulings frequently interpret "occasional" to mean up to one-third of a workday. *See* SSR 83-10.

The Commissioner correctly notes that an ALJ is not required to repeat the medical record word-for-word when constructing a claimant's RFC. However, "minimal" contact and interaction "up to one-third" of each day are not commensurate with one another. It is not clear whether the ALJ meant to adopt the state agency physician's meaning and just used poor wording, or whether she intended to expand "minimal" to a mean that Edwards could have greater contact with other people than the state physician contemplated. As this case requires remand on other grounds, the ALJ shall clarify her meaning and explain how the medical record supports her RFC finding on this issue.

### D.     The ALJ Should Clarify Her Reasoning at Step 4

Finally, Plaintiff claims that the ALJ erred at Step 4 by finding that he could perform his past work. Edwards' RFC limited him to "one- or two-step tasks involving only simple, routine and repetitive tasks[.]" (R. 31). The VE stated that this RFC would allow Edwards to work as a cleaner (DOT 919.687-014) or as warehouse worker (DOT 922.687-058). DOT job categories contain General Educational Development Scale ("GED") ratings in three divisions, including reasoning. Six reasoning levels exist. Both of the positions the VE identified require Level 2 reasoning. The DOT defines Level 2 reasoning as the ability to carry out "detailed but uninvolved written or oral instructions." By contrast, Level 1 reasoning involves the kind of "simple one- or two-step instructions" identified in Edwards'

RFC. (DOT, App. C). Plaintiff argues that Edwards' limitation to the one or two steps identified in the RFC fatally conflicts with the Level 2 reasoning required by his former work as a cleaner or warehouse worker.

Plaintiff has not provided any relevant authority to support this argument, and it is not entirely clear what the scope of the claim includes. It is true that Level 1 reasoning requires only "simple" tasks, while Level 2 involves "detailed" ones. This is not necessarily determinative, however, because the DOT and the Social Security regulations do not use the same standards for addressing a claimant's ability to perform job duties. For this reason, courts in this Circuit have largely concluded that "no one-to-one parallel can be found between 'simple' as it is used under the regulations and the DOT's requirements; a task may be 'simple' under the regulations and still involve the kind of 'detailed' tasks required under Level 2 reasoning." *Thompkins v. Astrue*, No. 09 C 1339, 2010 WL 5071193, at *10 (N.D. Ill. 2010 Dec. 6, 2010) (citing *Masek v. Astrue*, No. 08 C 1277, 2010 WL 1050293, at *22 (N.D. Ill. March 22, 2010)). *See also Money v. Barnhart*, 91 Fed.Appx. 210, 214 (3d Cir. 2004).

That said, Plaintiff's allegations primarily focus on the fact that Edwards' RFC limited him to no more than two-step tasks. Some courts have found that the addition of this language essentially restricts a claimant to Level 1 jobs. *See Skeens v. Astrue*, 903 F. Supp.2d 1200, 1209-11 (W.D. Wash. 2012) (remanding on this issue for clarification). Others have disagreed. *See Harrington v. Comm. of Soc. Sec. Admin.*, 08 cv 1330, 2008 WL 4492614, at *10 (S.D. Cal. Sept. 29, 2008) (finding that one or two step instructions are compatible with Level 2 reasoning).

The Seventh Circuit has not addressed the issue, but some courts in this Circuit

have concluded that one- or two-step tasks only involve Level 1 reasoning. *See Wiszowaty v. Astrue*, 861 F. Supp.2d 924, 947 (N.D. Ind. 2012); *Pomilia v. Astrue*, No. 2:11-CV-15, 2012 WL 691628 (N.D. Ind. March 2, 2012) (addressing Step 5).[5]  In *Pomilia*, the ALJ failed to recognize a conflict between the same RFC restriction of one- to two-step tasks and the VE's testimony that the claimant could perform jobs that required Level 2 and Level 3 reasoning. *Id*. at *19. *Pomilia* did not find outright error, but instructed the ALJ to ask the VE about it in light of the fact that the case required remand on other grounds. *Id*. at *20.  This Court follows the same directive, as this case is being remanded for further consideration.  The ALJ is instructed to clarify how her RFC would allow Edwards to perform his prior work if he were still alive.  She shall seek clarification from the VE concerning any conflict that may exist between the RFC and the Level 2 reasoning required for a cleaner and warehouse worker.

## IV.  Conclusion

For these reasons, the Court grants Plaintiffs' motion for summary judgment [38] and denies the Commissioner's motion [47].  This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

---

[5]  *Pomilia* also rejected substantially the same argument the Commissioner makes in this case on the GED issue, namely that the GED scale describes a claimant's general educational  development instead of the mental demands outlined in a RFC assessment. *Pomilia*, 2012 WL 691628 at *18 n.3 (citing cases).

ENTERED:

DANIEL G. MARTIN
United States Magistrate Judge

Dated: August 29, 2013